ELBA IRIZARRY, an Infant, by NATIVIDAD MARTINEZ, Her Guardian ad Litem, et al., Plaintiffs, *v.* ANTONIA CARDONA, Defendant.

City Court of the City of New York, Trial Term, Bronx County, December 16, 1954.

*Bernard Kessler* for plaintiffs.

*Edward Pine* for defendant.

QUINN, J.  When Elba Irizarry, the infant plaintiff, was seven years old she lived with her mother in a single room in the basement at 602 Tinton Avenue.  This house, a two-story, all-wooden structure, owned by the defendant, had been built in 1899.  It had been designed, constructed and approved as a dwelling for two families, living separately in the apartments on the first and second floors.  The basement, unpartitioned, had been planned for storage purposes only.  When Elba and her mother moved into the basement in February, 1951, it had been divided into living accommodations, of a sort, for three families.  Each family occupied a single room and shared in common some rudiments of kitchen facilities, as well as a small, windowless privy.  In the months of 1951, while Elba and her mother lived there, three other adults and five other children called that basement home.

Without the knowledge or consent of the department of housing and buildings or the Temporary State Housing Rent Commission and in violation of the statutes administered by these public bodies, the defendant had converted this unproductive basement space into a fruitful source of revenue yielding rentals in excess of $100 a month.  The two upper floors were separately occupied by at least two other tenants, so that the house was rented and used, during the time with which we are concerned, as a multiple dwelling, within the meaning of subdivision 7 of section 4 of the Multiple Dwelling Law.

In the evening of May 1, 1951, Elba's mother, as was her daily routine, called for Elba at the neighborhood nursery where she was cared for after school, while her mother pursued the role of family breadwinner. Elba was brought home, fed and preparatory to going out, in the encouragement of a regular habit, her mother took her to the toilet. This lone, basement sanitary facility was housed in a narrow cubicle bare of any other fixtures or furnishings, except for a single electric light outlet which, having fallen into a state of disrepair, had been dismantled by the defendant early in March of 1951. The sole means of illumination, then, provided by the landlord, was a candle perched on a ledge high in the wall.

When Elba entered the toilet, because of the damp condition of the floor and the absence of any holder or shelf in the wall within reach, she carried a supply of toilet tissue tucked under her right arm. Her mother reached up, lit the candle in its place in the wall, seated Elba upon the toilet seat and withdrew. Upon the closing of the water closet door, the candle toppled from its cranny in the wall above the toilet seat, fell upon Elba and ignited the paper under her arm. In the agonizing minute or so it took Elba's mother to answer the child's screams of terror and beat out the blaze, Elba had been severely burned along the inner side of her right arm in the region of the elbow.

In her immediate, panic-ridden anxiety to clean off the bits of charred paper and drops of candle grease adhering to the burned flesh, Elba's mother used a wet cloth. This, of course, offends against even the most elementary notions of first-aid treatment of burns. Yet it is not to be condemned in the light of what calm, informed afterjudgment would dictate. Rather, it is to be understood and condoned as the starkly instinctive, unreasoning urge of a frantic mother quickly to wipe away the evidences of hurt which suddenly mark her injured child.

Elba was rushed to Lincoln Hospital where her injuries, diagnosed as first, second and third degree burns, were treated, dressed and bandaged. She returned to the hospital two or three days later where, it was noted that, the burns having now become infected, she was to be admitted. However, after receiving some additional treatment, her arm was freshly bandaged and she was sent home to await the attendance of a specialist at Lincoln Hospital to examine the burns and decide upon such further procedures as might be indicated. After several fruitless inquiries at the hospital and a wait of some ten days Elba, with the bandage which had been placed on her arm at Lincoln Hospital still intact, was taken to Lebanon Hospital where she

was admitted and remained as a patient for forty-two days. In the course of treatment at the latter hospital, Elba underwent an operation in which a section of skin, borrowed from her abdomen, was grafted on to the most grievously burned or infected area of her right arm at the inner surface of the elbow.

At the trial, some three and a half years after the accident, Elba exhibited an ugly, disfiguring, continuous, keloid scar, about two to three inches in width, running from the midbiceps of her upper right arm to the mid forearm. Its rough uneven contours and angry, irregular excrescences spoke more eloquently than any power of words of the intense mental and physical anguish this bright, pleasant, attractive little girl was made to endure through the negligence of the defendant and without any want of care chargeable to the infant plaintiff.

It is the expressly declared purpose of the People of the State of New York in the enactment of the Multiple Dwelling Law to establish and maintain "proper housing standards requiring sufficient light, air, sanitation and protection from fire hazards," as essential to health and safety. (Multiple Dwelling Law, § 2.) The violation of a duty prescribed by statute as a safeguard "is * * * not merely some evidence of negligence, but negligence in itself". (*Martin* v. *Herzog,* 228 N. Y. 164, 169.) It was a violation of the statute, hence negligence, for the defendant to have converted the two-story frame dwelling into a *de facto* multiple dwelling. (Multiple Dwelling Law, § 9.) It was a violation of the statute and negligence for the defendant to have altered the basement from a storage space into living quarters and to have crowded ten persons into the sketchy, flimsy accommodations there provided. (Multiple Dwelling Law, § 34.) It was a violation of the statute and negligence for the defendant to have failed to repair, no less to have demolished, the electric light fixture in the common privy. (Multiple Dwelling Law, § 78.) It was a violation of the statute and negligence for the defendant to have failed to provide adequate illumination by gas or electricity in the water closet. (Multiple Dwelling Law, § 76, subd. 8.) It was an utter, diametric departure from the care a reasonably prudent person, owning, managing and controlling this two-story frame house, would have exercised, for the defendant to ignore the wise, cautious mandates and proscriptions of the statute, dictated by long, sad experience, and to permit and provide as the only means of illumination in the small, confined space of the basement water closet, used in common by ten persons, among them small children, a naked flame flickering from a candle stuck insecurely on the wall. The caveat of the

statute, as well as the widely advertised well-known and commonly accepted cautions on ordinary fire prevention in the home, make it abundantly clear to all but the most obtusely impercipient, that here was a brash flirtation with some sort of disaster by fire, envisaging probable injury of one kind or another to the dwellers in the basement. "It was not necessary that the defendant should have had notice of the particular method in which an accident would occur, if the possibility of an accident was clear to the ordinarily prudent eye." (*Munsey* v. *Webb*, 231 U. S. 150, 156; *Condran* v. *Park & Tilford*, 213 N. Y. 341, 345; *Robert* v. *United States Shipping Bd. Emergency Fleet Corp.*, 240 N. Y. 474, 477; *Palsgraf* v. *Long Island R. R. Co.*, 248 N. Y. 339, 344.) It is here found that it was reasonably foreseeable that the cumulative negligence of the defendant was **capable of** operating, and indeed did operate, as a proximate, efficient cause of the infant plaintiff's injuries.

The instinctive act of the mother in immediately applying a wet cloth to the child's burns and her delay, later on, in hospitalizing the child while (handicapped by language difficulties and extremely meagre financial means, with the timidity and imperfect understanding of one who, though a fellow citizen from an insular possession of the United States, is a stranger to our ways and procedures) she awaited the attendance of a medical specialist at Lincoln Hospital, are not such acts of culpable neglect as constitute the intervention of independent, intelligent causes which, breaking the chain of causality, relieve the defendant from liability for the end result of the original injury. " * * * a wrongdoer is liable for the ultimate result, though the mistake or even negligence of (one) who treated the injury may have increased the damage which would otherwise have followed from the original wrong." (*Milks* v. *McIver*, 264 N. Y. 267, 270.)

This court is keenly and regretfully aware that it is not its function, nor has it the power to lay the lash of the law, with well-deserved vigor, upon the back of the defendant for her callous indifference to the health, safety and security from economic oppression of the unfortunate refugees-from-the-housing-shortage she so outrageously exploited and gouged in flagrant disregard, if not open defiance, of the several statutes avowedly enacted for their protection. Assiduously and sternly repressing, then, every stirring of indignation and urge to impose exemplary damages, under one guise or another, this court adhering staunchly, however reluctantly, to the strict rule of compensatory damages merely, awards to the infant plaintiff for her personal injuries and consequent pain, suffering, dis-

ability, disfigurement and mental anguish, the sum of $6,000 and to her mother for her medical expenses and loss of services the sum of $1,000.

Findings of fact and conclusions of law having been waived, the foregoing embodies the decision of the court.

Judgment for the infant plaintiff, Elba Irizarry, in the sum of $6,000, and judgment for the plaintiff, Natividad Martinez, in the sum of $1,000.